United States District Court
Southern District of Texas
**ENTERED**
March 31, 2025
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **PAMELA GROTTS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | Civil Action No. 4:22-CV-02806 |
| | § | |
| **STATE FARM LLOYDS,** | § | |
| | § | |
| **Defendant.** | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pamela Grotts contends that her home suffered extensive damage when several pipes burst during Winter Storm Uri in February 2021. She filed a claim for water damage under her insurance policy with State Farm Lloyds. State Farm found that rodents had gnawed through Grotts's plumbing lines, causing gradual water seepage. Because Grotts's policy excludes damage from animals or water seepage, State Farm denied coverage. Grotts sued State Farm, alleging breach of contract and a host of extracontractual claims.

State Farm now moves for summary judgment on Grotts's claims. State Farm offers weather data disproving Grotts's frozen-pipes theory, as well as expert testimony, photographs of pre-existing damage, and water-usage data—all showing rodent damage and water seepage. In response, Grotts offers only two conclusory affidavits asserting frozen-pipe damage and an estimate that disclaims making any causation determinations. After careful review of the filings, the record, and the applicable law, the

Court **GRANTS** Defendant State Farm Lloyds's Motion for Summary Judgment.  (Dkt. No. 23).

## I.      BACKGROUND[1]

### A.      FACTUAL BACKGROUND

Pamela Grotts owns a home in Richmond, Texas.  (Dkt. No. 25-1 at 1).  In July 2020, State Farm issued Grotts an insurance policy covering the home for one year.  (Dkt. No. 23-9 at 45).  The policy covers "accidental direct physical loss to the property . . . unless the loss is excluded or limited."  (*Id.* at 17).  Excluded losses include those caused by (1) "animals" or (2) "seepage or leakage of water" from a "plumbing system" that is "continuous" or "gradual."  (*Id.* at 20–21).

In December 2020, Grotts filed a claim for water damage under the policy.  (Dkt. No. 23-4).  Photographs related to this claim show water and mold damage to the home's interior walls, as well as extensive rodent activity.  (*See id.* at 2–7).  State Farm inspected the home on January 21, 2021, and denied Grotts's claim about two weeks later.  (Dkt. No. 23-2 at 4).

Grotts filed a second claim for water damage, alleging that a February 2021 freeze (Winter Storm Uri) caused her pipes to burst.  (Dkt. No. 25-1 at 1, 3).  Grotts's state-court complaint alleges the date of loss as February 12, 2021.  (Dkt. No. 1-1 at 5).

---

[1]      Except where noted, this Section contains only undisputed facts, and all facts and reasonable inferences have been construed in favor of the nonmovant.  *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020).  The Court has not weighed evidence or made credibility findings.  *Id.*

State Farm investigated the claim and ultimately denied coverage.  (Dkt. No. 23-3 at 1); (Dkt. No. 23-1 at 2).  The investigation included an April 2021 inspection.  (Dkt. No. 23-2 at 2–3); (Dkt. No. 23-1 at 3).  The inspector concluded that the "leaks were likely caused by rodents biting through the pex pipe, causing water to accumulate in various parts of the ceiling."  (Dkt. No. 23-2 at 3).  Based on these findings, State Farm denied Grotts's claim.  (Dkt. No. 23-3 at 1).

Grotts retained an inspection and estimating firm, Quantum Claim Consulting Services ("Quantum"), to estimate repair costs.  (Dkt. No. 25-2 at 1, 4).  Quantum estimated repairs totaling $262,726.82.  (*Id.* at 1–2, 42–43, 47).  But the estimate report disclaims making any causation determinations.  (*See id.* at 4) (noting Quantum is "NOT a public adjusting firm" and only "provide[s] a disinterested third party estimate for the repairs to the subject property caused by a covered peril *as defined by* [the individual retaining Quantum]" (emphasis added)).

Grotts also obtained an affidavit from estimator Brandon Gadrow.  (*Id.* at 1–2).  In his affidavit, Gadrow identifies himself as a Quantum employee and Grotts's "Designated Estimator."  (*Id.* at 1).  Gadrow states that he "estimated the damages from water damages caused by a pipe burst . . . only and no pre-existing event or its damages caused all damages to the Property identified in my estimate."  (*Id.*).  But it is unclear whether Gadrow is offering opinions about causation or just describing the assumptions in his estimation work, consistent with Quantum's disclaimer.

Nearly a year later, on April 18, 2022, Grotts sent State Farm a letter demanding payment.  (Dkt. No. 19-3).  When that effort proved unsuccessful, Grotts sued State Farm

3

in state court, alleging breach of contract, violations of the Texas Insurance Code, breach of the duty of good faith and fair dealing, violations of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), fraud, and conspiracy. (Dkt. No. 1-1 at 10–20). State Farm removed the case to federal court based on diversity jurisdiction. (Dkt. No. 1 at 1-3).

During litigation, State Farm retained two consultants to conduct additional inspections: Jennifer Sheppard, a licensed engineer, and Alan Berryhill, an experienced general contractor. (Dkt. No. 23-5 at 1); (Dkt. No. 23-7 at 1). Both concluded that rodents chewed through Grotts's pipes causing long-term water damage. (Dkt. No. 23-5 at 2); (Dkt. No. 23-7 at 1).

State Farm now moves for summary judgment on all claims. (Dkt. No. 23).

## II.    LEGAL STANDARD

### A.    SUMMARY JUDGMENT

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the suit's outcome under governing law. *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). And "[a] dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *TIG Ins. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying the record evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

If the movant meets this burden, the nonmovant must come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c); *see also Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The nonmovant must "go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Nola Spice Designs, LLC v. Haydel Enters.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)). "The nonmovant must 'identify specific evidence in the record and . . . articulate the precise manner in which that evidence supports his or her claim.'" *Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 601 (5th Cir. 2017) (per curiam) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)), *as revised* (July 14, 2017). If evidence is merely colorable or not significantly probative, summary judgment is appropriate. *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019) (citing *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511).

In reviewing a motion for summary judgment, the district court views the evidence in the light most favorable to the nonmovant. *Carr*, 866 F.3d at 601. This means that courts must resolve factual controversies in the nonmovant's favor, "but only when . . . both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075.

### B.    TEXAS'S INSURANCE COVERAGE BURDEN-SHIFTING FRAMEWORK

Courts applying Texas law analyze coverage disputes under "the Texas insurance coverage burden-shifting framework." *Buchholz v. Crestbrook Ins.*, 65 F.4th 766, 773 (5th Cir. 2023). "In a coverage dispute, the insured has the burden first to prove that their loss falls within the terms of the contract." *Id.* at 769 (citing *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's, London*, 327 S.W.3d 118, 124 (Tex. 2010)). "Once the insured demonstrates this, the burden shifts to the insurer, who, to avoid liability, must show that the loss falls into an exclusion to the policy's coverage." *Id.* at 769–70 (first citing *Gilbert Tex. Constr., L.P.*, 327 S.W.3d at 124; and then citing Tex. Ins. Code § 554.002). If "the insurer proves that an exclusion applies, the burden shifts back to the insured to show that an exception to the exclusion brings the claim back within coverage." *Id.* at 770 (quoting *Gilbert Tex. Constr., L.P.*, 327 S.W.3d at 124).

An insured's burden to "prove that their loss falls within the terms of the contract" depends on the contract's terms. *Id.* at 769. So, courts "first look to 'the language of the policy.'" *Id.* (quoting *Gilbert*, 327 S.W.3d at 126).

Grotts's policy provides all-risks coverage for her home. (*See* Dkt. No. 23-9 at 17). "'All-risk' insurance covers any peril not specifically excluded in the policy." *ECF N.*

*Ridge Assocs., L.P. v. ORIX Cap. Markets, LLC*, 336 S.W.3d 400, 403 (Tex. App.—Dallas 2011, pet. denied).  Here, State Farm agreed to "pay for accidental direct physical loss to the property . . . unless the loss is excluded or limited" in the policy.  (Dkt. No. 23-9 at 17). The Supreme Court of Texas has described similar policy language as creating all-risks coverage.  *See JAW The Pointe, LLC v. Lexington Ins.*, 460 S.W.3d 597, 604 (Tex. 2015).

Even under an all-risks policy, "the insured has the burden first to prove that their loss falls within the terms of the contract."  *Buchholz*, 65 F.4th at 769.  But the burden is modest: insureds meet "their initial burden . . . simply by showing that their property suffered physical damage" during the policy period.  *Watson v. Allstate Tex. Lloyd's*, 224 F.App'x 335, 341 (5th Cir. 2007) (per curiam).  This means that "the insured has the initial burden to prove that the loss occurred" but "does not need to prove the cause of the loss." 7 Jordan R. Plitt et al., Couch on Insurance § 101:7 (3d ed. 2024).  Indeed, the Fifth Circuit recently held that a district court had "incorrectly applied the Texas insurance coverage burden-shifting framework" by requiring an insured to prove causation under an all-risks policy.  *Buchholz*, 65 F.4th at 772–73.

Once the insured makes the threshold showing of a loss during the policy period, "the burden shifts to the insurer, who, to avoid liability, must show that the loss falls into an exclusion to the policy's coverage."  *Id.* at 769–70; *see* 5 Jeffery E. Thomas et al., New Appleman on Insurance Law Library Edition § 41.02(1)(b)(i) (2024).  In fact, Texas has codified this aspect of the insurer's burden.  *See* Tex. Ins. Code § 554.002.  The Texas Insurance Code provides that (1) "the insurer . . . has the burden of proof as to any avoidance or affirmative defense" and (2) "[l]anguage of exclusion in the contract or an

exception to coverage claimed by the insurer . . . constitutes an avoidance or an affirmative defense." *Id.* Courts recognize that this statute requires insurers to prove exclusions to all-risks coverage. *See, e.g.*, *JAW The Pointe*, 460 S.W.3d at 603; *Crocker v. Am. Nat'l Gen. Ins.*, 211 S.W.3d 928, 936 (Tex. App.—Dallas 2007, no pet.); *Buchholz*, 65 F.4th at 769–70.

"Finally, 'if the insurer proves that an exclusion applies, the burden shifts back to the insured to show that an exception to the exclusion brings the claim back within coverage.'" *Buchholz*, 65 F.4th at 770 (cleaned up) (quoting *Gilbert*, 327 S.W.3d at 124). An insured can meet this burden by, for example, showing that a policy endorsement covers the loss despite the policy's exclusions. *See, e.g.*, *id.* at 772–73; *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins.*, No. 3:96-CV-01697, 1998 WL 59493, at *2 (N.D. Tex. Feb. 6, 1998).

Texas's burden-shifting framework matters because the parties' burdens at trial establish their burdens at summary judgment. "'Where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence,' which 'shifts to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.'" *Hall v. UiPath, Inc.*, 123 F.4th 419, 422 (5th Cir. 2024) (cleaned up) (quoting *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994) (per curiam)).

But when "the movant also carries the burden of proof at trial, as when he asserts an affirmative defense, his burden is even higher." *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021). The movant "must 'establish beyond peradventure'"—i.e., conclusively—"*all* of the essential elements of the claim or defense." *Id.* (emphasis in

original) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). "Only if the movant succeeds must the nonmovant 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 357 (5th Cir. 2017)).

So, an all-risks insurer moving for summary judgment must either (1) show that the insured has no evidence of a physical loss during the policy period or (2) conclusively establish that an exclusion applies. *See Guzman*, 18 F.4th at 160; *Buchholz*, 65 F.4th at 770; *Watson*, 224 F.App'x at 341. Conversely, an all-risks insured responding to summary judgment must (1) provide evidence showing a genuine issue of material fact about whether a loss occurred and, (2) only if the insurer has proved through its evidence that an exclusion applies, "designate specific facts showing that there is a genuine issue for trial" on the exclusion or whether an exception applies. *McCarty*, 864 F.3d at 357; *see Buchholz*, 65 F.4th at 770; *Watson*, 224 F.App'x at 341.

## III.    DISCUSSION

A simple principle resolves this case: When the movant makes a properly supported motion for summary judgment, the nonmovant must respond with more than conclusory, unsupported assertions. *Clark v. City of Alexandria*, 116 F.4th 472, 480 (5th Cir. 2024). The "purpose of summary judgment is to pierce the pleadings and assess the proof to determine if a genuine need for trial exists." *Beeler v. Rounsavall*, 328 F.3d 813, 816 (5th Cir. 2003) (citing *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). And "conclusory allegations supported by conclusory affidavits are insufficient to require a trial." *Huff v. Neal*, 555 F.App'x 289, 294

(5th Cir. 2014) (per curiam) (citing *Shaffer v. Williams*, 794 F.2d 1030, 1033 (5th Cir. 1986)). There is no reason to empanel a jury when, at the close of discovery, the movant has specific, probative, unchallenged evidence on essential issues, while the nonmovant still has only say-so and conjecture.

That is the case here. State Farm shows through weather data, uncontested expert testimony, photographic evidence, and water-usage data that rodents and gradual water seepage—both excluded by the policy, (Dkt. No. 23-9 at 20–21)—caused Grotts's damage, (Dkt. Nos. 23, 23-2, 23-4, 23-5, 23-7). Grotts responds with two conclusory affidavits (one of them her own) and an estimator's report that doesn't say anything about causation. (Dkt. Nos. 25, 25-1, 25-2). There is no need for a jury to weigh this "evidence" because there is nothing to weigh: "Conclusory allegations, speculation, and unsubstantiated assertions are not evidence." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999). State Farm is therefore entitled to summary judgment on Grotts's breach-of-contract claim.

Grotts's extracontractual claims suffer the same fate. Because Grotts's breach-of-contract claim fails, Grotts must show an "independent injury" to support her extracontractual claims. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 490 (Tex. 2018). She has not. The Court therefore grants summary judgment to State Farm on all claims.

### A.   BREACH OF CONTRACT

The Court first addresses Grotts's breach-of-contract claim, applying Texas's "insurance coverage burden-shifting framework," *Buchholz*, 65 F.4th at 773, while

keeping in mind the Parties' respective summary-judgment burdens, *Guzman*, 18 F.4th at 160.

### 1.    Grotts's Initial Burden

Under her all-risks policy, Grotts need only show an accidental physical loss during the policy period.  *See Buchholz*, 65 F.4th at 769, 773; *Watson*, 224 F.App'x at 341. Grotts has met this burden.

First, Quantum estimates repairs totaling $262,726.82.  (Dkt. No. 25-2 at 1–2, 42–43, 47).  Second, photographs taken on May 5, 2021, show extensive water damage throughout the home.  (*Id.* at 48–74).  Third, State Farm's January and April 2021 inspections found damage.  (Dkt. No. 23-4 at 1); (Dkt. No. 23-2 at 3).  There is no dispute that the damage was "accidental" within the meaning of the policy.  (*See* Dkt. No. 23-9 at 17) (defining "accidental" as "happening by chance, unexpectedly, and/or unintended from [the insured's] standpoint").

This evidence shows an accidental physical loss during the policy period.  Whether that loss resulted from a covered or excluded cause is a separate question.  *See Buchholz*, 65 F.4th at 772–73.  At this initial stage, Grotts need only show that a physical loss occurred—she doesn't need to prove what caused it.  *Buchholz*, 65 F.4th at 769; *Watson*, 224 F.App'x at 341.  The burden now shifts to State Farm to prove that an exclusion applies.  *Buchholz*, 65 F.4th at 769–70.

### 2.    State Farm's Burden

State Farm presents compelling—and generally uncontradicted—evidence that Grotts's damage resulted from excluded causes.  Weather data shows that temperatures

remained above freezing on the date of the loss, disproving Grotts's frozen-pipes theory. (Dkt. No. 23-5 at 2). Three property inspections documented widespread evidence of rodent damage and long-term water leakage. (*Id.* at 1-2); (Dkt. No. 23-7 at 1). Photographs from Grotts's December 2020 claim show water and rodent damage months before Winter Storm Uri. (Dkt. No. 23-7 at 1); (Dkt. No. 24-4). Finally, the property's water-usage data shows spikes in consumption followed by periods of no usage—a pattern consistent with leaks being discovered and the water being shut off in response—suggesting a long-term water-leakage issue. (Dkt. No. 23-5 at 2).

### a.    State Farm's evidence disproves Grotts's frozen-pipe theory

First, weather data for the day and week of February 12 conclusively refutes Grotts's frozen-pipe theory. Grotts alleges in her state-court complaint that the date of loss was February 12, 2021. (Dkt. No. 1-1 at 5). This is also the date listed in State Farm's claim file. (Dkt. No. 23-2 at 1).

State Farm's inspector notes in his report that a "[v]erified Accuweather report, dated 2/12/2021, [shows] that the temperature on the date of reported loss was between 34–37 degrees" and that February 12 was "two days before the freeze event" in Richmond. (*Id.* at 2). Another of State Farm's consultants states that the National Weather Service shows temperatures in the Richmond area ranging from 35 to 76 during the week of February 12, 2021, never falling below freezing. (Dkt. No. 23-5 at 2). And a third confirms that Winter Storm Uri did not hit the Houston–Richmond area until February 13, 2021. (Dkt. No. 23-7 at 2).

This evidence, if uncontradicted, is fatal to Grotts's frozen-pipe theory. *See Congemi v. Wal-Mart Stores E., LP*, No. 7:19-CV-08220, 2021 WL 4066653, at *7 (S.D.N.Y. Sept. 7, 2021) ("The Court takes judicial notice of the fact that water freezes at 32 degrees Fahrenheit . . . ."); *Judicial Notice*, Black's Law Dictionary (12th ed. 2024) (citing the freezing point of water as the textbook example of a fact subject to judicial notice).

But rather than dispute State Farm's weather data, Grotts attempts to change the date of the loss. While she originally alleged that the damage happened on February 12, (Dkt. No. 1-1 at 5), Grotts now claims that her "home and personal property suffered severe damages from water damage caused by a pipe burst resulting from a freeze on February 16, 2021," (Dkt. No. 25-1 at 1).

The Fifth Circuit "has long noted that factual statements in the pleadings constitute binding judicial admissions, or at the very least adverse evidentiary admissions." *McCreary v. Richardson*, 738 F.3d 651, 659 n.5 (5th Cir. 2013) (per curiam) (collecting cases), *as revised* (Oct. 9, 2013). In fact, the Fifth Circuit has held that no matter "which document contains the more accurate account, [plaintiffs] are bound by the admissions in their pleadings." *Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d 105, 108 (5th Cir. 1987) (per curiam). As a result, "no factual issue can be evoked by comparing their pleadings with [plaintiffs' later-filed] affidavit." *Id.*

Simply put, "[f]acts that are admitted in the pleadings are no longer at issue." *Id.* (quoting *Ferguson v. Neighborhood Hous. Servs., Inc.*, 780 F.2d 549, 551 (6th Cir. 1986)); *accord State Farm Fire & Cas. Co. v. Flowers*, 854 F.3d 842, 845 (5th Cir. 2017) (granting summary judgment based on judicial admissions in answer notwithstanding later

deposition testimony allegedly creating fact issue); *Monocoque Diversified Ints. v. TVPX Aircraft Sols., Inc.*, No. 1:21-CV-00708, 2024 WL 4526042, at *5 (W.D. Tex. Aug. 14, 2024) ("In this case, Plaintiffs have not amended the complaint.  They merely take a contradictory stance at summary judgment.").

In her state-court petition, the live pleading in this case, Grotts alleges that the damage happened on "FEBRUARY 12, 2021."  (Dkt. No. 1-1 at 5).  If Grotts believed that February 16, 2021, was the true date of loss, her recourse was to amend the complaint. As it stands, Grotts cannot manufacture a fact issue by claiming a new date of loss in her affidavit.  *See Davis*, 823 F.2d at 108.

Because February 12, 2021, is the controlling date of loss, and because State Farm's uncontradicted evidence shows that it did not freeze that day, Grotts's frozen-pipe theory fails.  And while proof that Grotts's damage was *not caused* by frozen pipes is not proof that it *was caused* by rodents or seepage, disproving the only other theory of causation goes quite a long way.

### b.    State Farm has presented evidence of excluded causes

State Farm presents evidence through three property inspections, documentation from a prior claim, and water-usage data that shows how Grotts's loss resulted from excluded causes.  Grotts's policy excludes losses caused by the continuous or gradual "seepage or leakage of water . . . from a . . . plumbing system."  (Dkt. No. 23-9 at 20).  The policy also excludes losses caused by "all animals," including damage resulting from "gnawing."  (*Id.* at 21).

State Farm's evidence shows that Grotts's loss falls within the policy's water-leakage exclusion.  While State Farm need only prove one exclusion to negate coverage, *see Hi-Port, Inc. v. Am. Int'l Specialty Lines Ins.*, 22 F.Supp.2d 596, 599 (S.D. Tex. 1997), the unchallenged testimony of State Farm's three inspectors also conclusively shows that the policy's animal exclusion applies.

i.      Inspections

State Farm inspected Grotts's property three times in relation to her February 2021 claim.  First, David Chaney inspected the property on April 2, 2021.  (Dkt. No. 23-2 at 2).  Second, Jennifer Sheppard inspected the property for BSC Forensic Services, though the date is not in the record.  (Dkt. No. 23-5 at 1–2).  Third, Alan Berryhill inspected the property on March 23, 2023.  (Dkt. No. 23-7 at 1).  All three determined that rats chewed through Grotts's pipes causing long-term water damage.    (*Id.*); (Dkt. No. 23-2 at 2–3); (Dkt. No. 23-5 at 2).

First, David Chaney and his trainer inspected the property on April 2, 2021.  (Dkt. No. 23-2 at 2).  "After inspecting the water lines in the attic, [they] were able to find holes in the 1/2 pex pipe which appear to be caused by rats."  (*Id.* at 3).  Based on his inspection, Chaney concluded that the "leaks were likely caused by rodents biting through the pex pipe, causing water to accumulate in various parts of the ceiling."  (*Id.*).  He was "certain that the water leaks were not caused by burst pipes from the freeze."  (*Id.*).  In his view, Grotts's February 2021 claim was just "a continuation of" her earlier December 2020 claim.  (*Id.*).

15

Second, Jennifer Sheppard inspected the property for BSC Forensic Services. (Dkt. No. 23-5). Her inspection revealed "widespread areas with sharp-edge holes consistent with tooth and/or paw-related openings from apparent rodent activity" in the plumbing. (*Id.* at 2). Comparing the location of the holes with past photographs—Grotts's house was down to the studs by this point[2]—showed "interior moisture exposure conditions at areas adjacent to observed sharp-edge holes in the exposed water supply piping." (*Id.*). Based on these findings, BSC formed a "professional opinion" that Grotts's damage resulted from "historical and ongoing water supply leaks at the residence associated with apparent rodent activity as well as a lack of appropriate remediation following moisture exposure." (*Id.*).

Third, contractor Alan Berryhill inspected the property on March 23, 2023. (Dkt. No. 23-7 at 1). He found evidence of mold growth and long-term water damage that "likely predated December 2020." (*Id.*). He also found "extensive rodent damage to the plastic PEX water supply lines both upstairs and downstairs." (*Id.* at 1). Berryhill determined that these conditions caused the December 2020 plumbing leak and that the failure to repair this damage allowed conditions to deteriorate. (*Id.* at 2–3). Ultimately, he concluded that "the cause of damage at the Grotts property is long-term rodent damage to water lines" that "resulted in leakage into the house." (*Id.* at 3).

---

2    (*See* Dkt. No. 23-2 at 4) (inspection notes from April 1, 2021: "[Pamela Grotts] stated that her [contractor], Scott Silvey has a 10 day window and needs to begin working on her home."); (*Id.* at 3) (notes from April 2, 2021: "[Silvey] is planning on demoing the home as early as this weekend."); (Dkt. No. 25-2 at 49-74) (pictures taken "5/20/21" showing the house gutted).

Three inspections, one conclusion: Rodents gnawed through Grotts's plumbing lines, causing leaks and long-term water damage. (*Id.*); (Dkt. No. 23-2 at 2–3); (Dkt. No. 23-5 at 2).

ii.    Evidence from December 2020 Claim

Furthermore, photographs from Grotts's December 2020 claim indicate that water damage had already occurred before she filed her claim in February 2021. Two months before her February 2021 claim for alleged Winter Storm Uri damage, Grotts filed another claim for water damage under the same policy. (*See* Dkt. No. 23-4 at 1). Photographs from a January 21, 2021, inspection related to this claim show widespread water and mold damage throughout the home's interior, including staining and deterioration of the walls, ceilings, and flooring. (*Id.* at 2–7); (Dkt. No. 23-2 at 4). There are also clear signs of a rodent infestation. (Dkt. No. 23-4 at 2–7). One photo shows a dead rat in a mousetrap lying on a carpet stained with urine and covered in droppings. (*Id.* at 6). These pictures, along with the fact that Grotts filed a claim for water damage in December 2020, suggest that there were water-leakage issues in the home months before Winter Storm Uri.

This is confirmed by expert analysis. Based on the January 2021 photos, Chaney concluded that Grotts's claim in February 2021 was "a continuation of the first claim" from December 2020. (Dkt. No. 23-2 at 3). Berryhill attests that the "decayed flooring and trim, mold growth on the walls and other finishes, and other obvious evidence of long-term water damage" depicted in the photos "indicate[d] that the conditions in the house likely predated December 2020." (Dkt. No. 23-7 at 2). Likewise, Sheppard concluded that the photos "depicted moisture exposure conditions in the dining room as

17

well as apparent microbial growth along the lower wall finishes of several rooms, which confirmed moisture exposure conditions at the residence prior to the reported February 2021 date of loss." (Dkt. No. 23-5 at 1).

In sum, the photographic evidence from Grotts's December 2020 claim shows pre-existing water and mold damage. (Dkt. No. 23-4 at 2–7). This evidence suggests that Grotts's damage resulted from continuous, gradual seepage and leakage from her home's plumbing system over the course of several months—precisely the type of loss excluded under her policy. (Dkt. No. 23-9 at 20).

### iii.    Water-Usage Data

Finally, water-usage data at the property is consistent with a long-term water-leakage problem in the home. As part of its investigation, BSC Forensics "graphed the provided water usage data" at Grotts's house. (Dkt. No. 23-5 at 2). The graph revealed "multiple relatively high water usage events as well as the multiple relatively low water usage periods, including time periods with shut off water supply." (*Id.*). This pattern of usage spikes followed by shutoffs is "consistent with multiple fugitive water leak events" followed by repair efforts. (*Id.*). It is also consistent with the evidence of "multiple historical remedial repairs to the water supply piping at the residence" found in Sheppard's inspection. (*Id.* at 1). This evidence further shows that the water damage to Grotts's home resulted from an ongoing water-leakage problem rather than a single freeze event.

* * *

In sum, State Farm has both (1) disproved Grotts's frozen-pipes theory and (2) supported its theories of causation with substantial, consistent, and direct expert testimony and documentary evidence.   State Farm has thus established "beyond peradventure" that Grotts's damage resulted from long-term water seepage or leakage in the house's plumbing lines.  *Fontenot*, 780 F.2d at 1194.  And though State Farm need only prove one exclusion to negate coverage, *Hi-Port, Inc.*, 22 F.Supp.2d at 599, State Farm's expert testimony and documentary evidence also show that rats caused the plumbing leaks.   Because both animals and long-term water leakage are excluded causes under Grotts's policy, (Dkt. No. 23-9 at 20–21), State Farm has carried its summary-judgment burden of showing that Grotts's "loss falls into an exclusion to the policy's coverage," *Buchholz*, 65 F.4th at 769–70.

### 3.   Grotts's Response

Because State Farm has carried its burden, Grotts must now respond by "designat[ing] specific facts showing that there is a genuine issue for trial." *Guzman*, 18 F.4th at 160 (quoting *McCarty*, 864 F.3d at 357).  She has not.

Grotts responds with (1) her own affidavit, (Dkt. No. 25-1); (2) the affidavit of her "Designated Estimator," Brandon Gadrow, (Dkt. No. 25-2 at 1–2); and (3) the 2021 estimate report prepared by Quantum, (*id.* at 4–75).  This evidence does not show a genuine issue of material fact on causation.  Both affidavits contain only conclusory, unsupported assertions about causation, (*see id.* at 1–2); (Dkt. No. 25-1), and the Quantum

estimate explicitly disclaims any independent causation determination, (Dkt. No. 25-2 at 4).

Turning first to her affidavit, Grotts simply declares that her "home and personal property suffered severe damages from water damage caused by a pipe burst resulting from a freeze on February 16, 2021." (Dkt. No. 25-1 at 1). The affidavit gives no factual details about what Grotts observed, the location of any burst pipes, the timing and progression of water damage, or anything else that might explain Grotts's conclusion. (*Id.* at 1–6). And as the Court has already explained, February 16, 2021, is not the relevant date of loss. *See supra* Section III(A)(2)(a).

"[U]nsupported affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." *Orthopedic & Sports Inj. Clinic v. Wang Lab'ys, Inc.*, 922 F.2d 220, 225 (5th Cir. 1991) (ellipses and some internal quotations omitted) (quoting *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985)). Without any specific facts explaining the basis for her assertion that frozen pipes caused the damage, Grotts's affidavit does not create a genuine fact issue. *See, e.g.*, *Stagliano v. Cincinnati Ins.*, 633 F.App'x 217, 220 (5th Cir. 2015) (per curiam) (finding "conclusory, 'subjective opinion'" about storm damage insufficient to defeat summary judgment on coverage).

As for Gadrow's affidavit, it is unclear whether Gadrow is even offering opinions about causation. Gadrow identifies himself as a Quantum employee and Grotts's "Designated Estimator." (Dkt. No. 25-2 at 1). Gadrow states that he "was tasked with damages" "from water damages caused by a pipe burst as a result of a freeze" and that

he "estimated the damages from water damages caused by a pipe burst . . . only and no pre-existing event or its damages caused all damages to the Property identified in my estimate." (*Id.*).

Yet the estimate attached to Gadrow's affidavit states that Quantum "is NOT a public adjusting firm" but rather "an inspection and estimating firm contracted by Others to provide a disinterested third party estimate for the repairs to the subject property caused by a covered peril *as defined by Others*." (*Id.* at 4) (emphasis added). So, Gadrow's statements may simply describe the assumptions underlying his cost estimation, consistent with Quantum's disclaimer.[3]

In any case, to the extent Gadrow's affidavit offers opinions about causation, his opinions are conclusory. In *Smiley Team II, Inc. v. General Star Insurance Co.*, the district court considered an affidavit submitted by Richard Gadrow that was nearly identical to the one submitted by Brandon Gadrow in this case. No. 3:21-CV-00103, 2022 WL 18909496, at *3–4 (S.D. Tex. Oct. 28, 2022), *aff'd*, No. 23-40129, 2024 WL 2796652 (5th Cir. May 31, 2024) (per curiam); *compare* (Dkt. No. 25-2 at 1–2) (Brandon Gadrow's affidavit) *with Smiley Team II v. Gen. Star Ins.*, No. 3:21-CV-00103, 2022 WL 17552630 (S.D. Tex. Sept. 28, 2022), ECF No. 31-1 at 1–2 (Richard Gadrow's affidavit). The affidavit in *Smiley Team II* contained the same unsupported assertions about causation as well as the statement

---

[3]    Grotts does not provide Gadrow's opinions about causation in her Rule 26 disclosures. (*See* Dkt. No. 35 at 1). Even for experts who are not required to prepare a report, a party must disclose "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(B)–(C). That Grotts does not disclose any of Gadrow's opinions about causation suggests that he does not have any.

that "no pre-existing event or its damages caused all damages identified in [the] estimate."  2022 WL 18909496, at *3; (Dkt. No. 25-2 at 1) (". . . no pre-existing event or its damages caused all damages to the Property identified in my estimate.").

The court held that the "affidavit provide[d] conclusory statements and ultimate facts amounting to a naked assertion" about causation.  2022 WL 18909496, at *4. "Moreover," the court continued, Gadrow's "affidavit provide[d] no factual basis for evaluating how he arrived at his findings, other than that he based his estimate on his observations, experience, and training." *Id.*  The court thus held that the affidavit did not create a fact issue on causation and therefore granted summary judgment to the insurer. *Id.* at *4, 7.

The insured appealed, and the Fifth Circuit affirmed. *Smiley Team II, Inc. v. Gen. Star Ins.*, 2024 WL 2796652, at *1–2 (5th Cir. May 31, 2024) (per curiam).  The Fifth Circuit agreed that Gadrow's affidavit contained only "conclusory statements and naked assertions" about causation and provided "no supporting factual evidence or methodology for how he arrived at the conclusion." *Id.*  at *1.  Accordingly, the panel held that Gadrow's "affidavit [was] not sufficient to defeat summary judgment." *Id.*; *see Stagliano*, 633 F.App'x at 220 (affirming summary judgment where the expert's affidavit offered just a "conclusory, 'subjective opinion' that the damage resulted from a hail storm within the policy period").

Though unpublished, these cases are unusually persuasive given the nearly identical facts.  Consistent with those cases, the Court finds that Brandon Gadrow's opinions regarding causation (if he has any) are unexplained, unsupported, and therefore

conclusory. As a result, they do not create a fact issue on causation.[4] *See Orthopedic*, 922 F.2d at 225.

Finally, Grotts offers the 2021 Quantum estimate. (Dkt. No. 25-2 at 4–75). But the Quantum estimate disclaims any independent determinations about causation, (*id.* at 4), and—true to this disclaimer—offers none, (*see generally id.* at 4–75). The estimate is, as the district court in *Smiley Team II* described a similar Quantum estimate, "a compilation of figures in tables estimating damages, [along with] photos of the Property in various states of disrepair." 2022 WL 18909496, at *4. Grotts does not even attempt to explain how the Quantum estimate creates a fact issue on causation. (*See* Dkt. No. 25 at 3–4). The Court finds that it does not.

* * *

In sum, none of Grotts's evidence creates a genuine fact issue on causation. Her affidavit makes only conclusory assertions about frozen pipes. (Dkt. No. 25-1 at 1). The Quantum estimate explicitly disclaims making any causation determinations and offers none. (Dkt. No. 25-2 at 4). And Gadrow's affidavit either (1) describes the assumptions underlying his cost estimates or (2) offers unexplained conclusions about causation without any supporting facts or methodology. (*Id.* at 1–2).

---

[4]    State Farm also raises evidentiary concerns about Gadrow's affidavit and authenticity concerns about "his" estimate. (*See* Dkt. No. 28 at 4) (suggesting that Brandon Gadrow is in fact acting as a stand-in for Richard Gadrow, the estimator who actually inspected Grotts's property and prepared the Quantum estimate). The Court need not address these concerns because Brandon Gadrow's affidavit, even if considered, does not raise a fact issue.

"Conclusory allegations and unsubstantiated assertions are not evidence, no less competent summary judgment evidence." *Prospect Energy Corp. v. Dall. Gas Partners, LP*, 761 F.Supp.2d 579, 601 n.21 (S.D. Tex. 2011) (citing *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996)).  The Court therefore **GRANTS** summary judgment for State Farm on Grotts's breach-of-contract claim.  *See Watson*, 224 F.App'x at 342 (affirming summary judgment where insured offered only "speculation—not implausible but unsupported—that the under-slab leaks caused the interior mold and water damage" in response to "a specific expert opinion excluding the subsurface leaks as a cause of that damage"); *Smiley Team II*, 2024 WL 2796652, at *1–2.

### B.    EXTRACONTRACTUAL CLAIMS

In addition to her breach-of-contract claim, Grotts brings several extracontractual claims: violations of the Texas Insurance Code, breach of the duty of good faith and fair dealing, violations of the DTPA, fraud, and conspiracy.  (Dkt. No. 1-1 at 12–20).

The general rule is that extracontractual claims do not survive "[w]hen the issue of coverage is resolved in the insurer's favor." *State Farm Lloyds v. Page*, 315 S.W.3d 525, 532 (Tex. 2010); *see Menchaca*, 545 S.W.3d at 490 ("The general rule is that an insured cannot recover policy benefits for an insurer's statutory violation if the insured does not have a right to those benefits under the policy.").

But there is a narrow exception to this general rule where the insured establishes an injury that is "independent" of the insured's rights under the contract. *Menchaca*, 545 S.W.3d at 499.  "The Supreme Court of Texas has emphasized just how rare a successful independent injury claim is." *Fric v. Allstate Life Ins.*, 664 F.Supp.3d 756, 768 (S.D. Tex.

24

2023) (citing *Menchaca*, 545 S.W.3d at 500).  As the Supreme Court of Texas explained in

2018, the "reference in [a past case] to 'the possibility' that a statutory violation could

cause an independent injury suggested that a successful independent-injury claim would

be rare, *and we in fact have yet to encounter one*."  *Menchaca*, 545 S.W.3d at 500 (emphasis

added) (quoting *Republic Ins. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995)).  This is because

the exception applies only when the insurer commits "some act, *so extreme*, that [it] would

cause injury independent of the policy claim."  *Stoker*, 903 S.W.2d at 341 (emphasis

added).

Grotts's evidence of an independent injury consists entirely of her own conclusory

affidavit.  (Dkt. No. 25-1 at 1–5).  Despite referencing her "independent injur[-y, -ies]" 16

times, Grotts offers no actual evidence of an independent injury, only assertions and

recitations of the legal standard.  (*See id.*).  For example, Grotts states that her "mental

anguish and emotional distress constitute independent injuries apart from benefits under

the contract, falling within the scope of the independent injury."  (*Id.* at 4).  Elsewhere:

"Defendant Insurer's breach of statutory obligations . . . resulted in independent injury,

a distinct form of harm separate from physical damages covered [by] Defendant Insurer's

Policy . . . ."  (*Id.* at 2).

If these sorts of conclusory, unsupported allegations were enough to establish an

independent-injury claim, these claims would not be "rare" but routine.  *Menchaca*, 545

S.W.3d at 500.  That is why courts consistently hold that "[v]ague, conclusory allegations

that [the insured] suffered 'actual damages,' unsupported by any evidence, are not

sufficient to establish a genuine dispute of material fact as to whether [the insured]

suffered an injury independent of its right to receive policy benefits." *First Baptist Church Daisetta Tex. v. Church Mut. Ins.*, No. 1:23-CV-00193, 2024 WL 3635304, at *6 & n.2 (E.D. Tex. May 29, 2024) (collecting cases). The Court therefore **GRANTS** summary judgment in favor of State Farm on Grotts's extracontractual claims.[5]

## IV.    CONCLUSION

For the reasons above, the Court **GRANTS** Defendant State Farm Lloyds' Motion for Summary Judgment. (Dkt. No. 23). Grotts's claims are **DISMISSED WITH PREJUDICE.**

IT IS SO ORDERED.

Signed on March 30, 2025.

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**

---

[5]    Grotts also brings fraud and conspiracy claims. (Dkt. No. 1-1 at 19–20). State Farm contends that Grotts has no evidence of fraud or conspiracy. (Dkt. No. 23 at 12–13). In response, Grotts cites no evidence of fraud or conspiracy. (*See* Dkt. 25 at 14). State Farm is therefore entitled to summary judgment on Grotts's fraud and conspiracy claims.